UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Matthew Tracer,

     Plaintiff,

v.                         Case No.  14-11777

City of Allen Park, *et al.*,       Sean F. Cox
                                     United States District Court Judge

     Defendants.

_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     Plaintiff is a resident of the City of Allen Park, Michigan who filed this § 1983 action

against the City and its mayor following his arrest relating to his conduct at a city council

meeting.  Plaintiff alleges that Defendants violated his First and Fourth Amendment rights and he

also asserts various state-law claims.  The matter is currently before the Court on Defendants'

Motion for Summary Judgment.[1]  As explained below, Plaintiff agrees that his First Amendment

claims against Defendant Matakas in his official capacity should be dismissed as duplicative of

his First Amendment claims against the City.  In addition, the Court shall grant summary

judgment in favor of Defendants as to Plaintiff's malicious prosecution, false arrest, and false

imprisonment claims.  The motion shall be denied in all other respects.

---

[1]The motion does not challenge all of Plaintiff's claims and, therefore, is actually a
motion seeking partial summary judgment.

# BACKGROUND

**A.**     **Procedural Background**

Plaintiff Matthew Tracer ("Plaintiff" or "Tracer") filed this action on May 2, 2014,

asserting claims against the City of Allen Park and its Mayor, William Matakas ("Matakas").

Plaintiff's complaint asserts the following six counts:

- "Violation of 1st Amendment" of the United States Constitution (Count I): wherein Tracer alleges that Defendants violated his First Amendment rights by: 1) improperly banning him from speaking at the May 14, 2013 meeting of the Allen Park City Council; and 2) arresting him on May 28, 2013, in order to prevent him from speaking at the May 28th meeting of the Allen Park City Council.

- "Violation of the 4th Amendment of the Constitution of the United States of America – False Arrest and State Tort Claim of False Arrest" (Count II): wherein Tracer alleges that he was arrested on May 28, 2013, although "[n]o arrest warrant was signed to allow the Allen Park Police Department to arrest Plaintiff on May 28, 2013."  (Compl. at 5-6).

- "Retaliation Against Plaintiff In Violation of the 1st Amendment of the Constitution of the United States of America" (Count III): wherein Tracer alleges that Defendants retaliated against him for his having engaged in protected activity, in violation of the First Amendment, by arresting him before the May 28, 2013 meeting of the Allen Park City Council.

- "Violation of the 4th Amendment of the Constitution of the United States of America – False Imprisonment – and State Tort Claim of False Imprisonment" (Count IV): wherein Tracer alleges he was "falsely imprisoned by Defendants." (Compl. at 7).

- "Violation of the 1st and 4th Amendment of the Constitution of the United States of America – Malicious Prosecution – and State Tort Claim of Malicious Prosecution" (Count V[2]): wherein Tracer alleges that Defendants maliciously prosecuted him, in order to silence him from speaking at the May 28, 2013 meeting.

---

[2]Plaintiff's Complaint numbered both the fourth and fifth counts as "Count IV."  The Court shall refer to the last two counts as Counts VI (Abuse of Process) and VII (Intentional Infliction of Emotional Distress).

- "Abuse of Process" (Count VI): wherein Tracer alleges that Matakas unlawfully used the Allen Park Police Department to arrest, imprison, and silence him in violation of his rights.

- "Intentional Infliction of Emotional Distress" (Count VII): wherein Tracer alleges that "Defendants and their employees conduct and actions against Plaintiff were extreme and outrageous" and caused him to suffer severe emotional damages.

Following the close of discovery, Defendants filed a Motion for Summary Judgment. The motion has been fully briefed by the parties and the Court heard oral argument on July 2, 2015.

On July 6, 2015 this Court issued an order requiring supplemental briefs (Docket Entry No. 30) that stated:

> In the pending motion, Defendants assert that even if Tracer "had a sustainable *Fourth Amendment claim*" against Matakas in his individual capacity, Matakas is nonetheless entitled to qualified immunity. (Defs.' Br. at 20-21) (emphasis added). Defendants' motion, however, gives short shrift to the assertion of qualified immunity, presenting it as the last issue in their motion and devoting just one page to it. Moreover, most of that one page discusses the standard, not the application of it in this case. Defendants' motion only appears to assert that Matakas is entitled to qualified immunity as to the "Fourth Amendment" claims asserted against Matakas, which are the false arrest, false imprisonment, and malicious prosecution claims. The other Constitutional claims, the free speech claims, are brought under the First Amendment and thus do not appear to be challenged in terms of qualified immunity in the motion.
>
> In responding to the Motion, Plaintiff makes arguments concerning governmental immunity under Michigan law. (*See* Pl.'s Br. at 24). But Defendants have not made any challenges based on governmental immunity under Mich. Comp. Laws § 691.1407. Rather, Defendants' motion asserts that Matakas is entitled to *qualified immunity*.
>
> Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether

3

government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation.

Given that neither party has sufficiently addressed this important issue, the Court hereby **ORDERS** that:

1)   No later than **July 16, 2015**, Defendants shall file a supplemental brief of no more than 10 pages that *only addresses qualified immunity*.  That brief must: 1) specify, by count, the claims to which Defendant asserts that he is entitled to qualified immunity; and 2) explain why Defendant Matakas believes that he is entitled to qualified immunity.

2)   No later than **July 30, 2015**, Plaintiff shall file a supplemental brief of no more than 10 pages that *only addresses qualified immunity*. That brief must respond to Defendant's arguments and explain why Plaintiff believes that Defendant Matakas is not entitled to qualified immunity.

   **IT IS SO ORDERED.**

(Docket Entry No. 30) (bolding and italics in original).

On July 16, 2015, Defendants filed a supplemental brief. (Docket Entry No. 31).[3]

Plaintiff filed his supplemental brief on July 29, 2015.  (Docket Entry No. 32).  Accordingly, the motion is now ready for a decision by this Court.

_____

   [3]Although this Court's order expressly limited the supplemental briefs to discussing qualified immunity, Defendants' supplemental brief contains an argument based on Mich. Comp. Laws § 691.1407 (*See Id.* at 11 n.1).  The Court will not consider that argument, which was not raised in Defendants' Motion for Summary Judgment and was raised in the supplemental brief in violation of the terms of this Court's order for supplemental briefs.

**B.** **Standard of Decision**

Under Fed. R. Civ. P. 56(a), summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "No genuine dispute as to any material fact exists where the record 'taken as a whole could not lead a rational trier of facts to find for the non-moving party.'" *Shreve v. Franklin County, Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) (citing *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Ultimately, the court evaluates 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Shreve, supra* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

On summary judgment, the Court views the facts and draws all inferences in the light most favorable to the non-moving party. *Id*. Fed. R. Civ. P. 56(c)(1) provides:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

5

**C.**     **Evidence Submitted By The Parties, Taken In The Light Most Favorable To The Non-Moving Party**

The following material facts are gleaned from the evidence submitted by the parties, taken in the light most favorable to Tracer, the non-moving party.

Tracer is a resident of the City of Allen Park, Michigan. Matakas is the Mayor of the City of Allen Park.

The City of Allen Park Rules of Decorum for Public Meetings (Ex. 1 to Defs.' Br.) provides, in pertinent part, that: "All comments shall be directed only to the Chairperson. Speakers are not to address other members of the council or members of the audience," "No person or group shall be allowed to disrupt the meeting or proceedings," and "Any individual, who fails to comply with these rules after having first been warned by the Chairperson to cease such actions, shall be ordered by the Chairperson to leave and/or be ejected from the meeting."

Chapter 26, Section 214 of the City of Allen Park's Code of Ordinances is titled "Disturbing the peace" and provides that "No person in the city shall disturb, tend to disturb or aid in disturbing the peace of others by violent, tumultuous, offensive or obstreperous conduct, and no person shall knowingly permit such conduct upon any premises owned or possessed by him or under his control."

Chapter 26, Section 217 of the City of Allen Park's Code of Ordinances is titled "Disturbance of lawful meeting" and provides that "No person shall make or excite any disturbance or contention in, or fail to leave upon being requested to do so, any private or public meeting, conducted on or in private or public property, where citizens are peaceably and lawfully assembled."

6

**Tracer's Prior Arrest And Prior Civil Action Against Allen Park.**

In 2009, Tracer was arrested by the Allen Park Police Department. (Pl.'s Dep. at 23-24). Following his arrest in 2009, Tracer filed a civil action relating to that arrest, alleging that Allen Park police officers illegally arrested him and broke his ribs in doing so. (Pl.'s Compl. at 6). (*Id*.).

After that civil action had ended, in approximately January of 2012, Plaintiff began regularly attending meetings of the Allen Park City Council. (*Id*.). Matakas, the City of Allen Park's Mayor, presided over the meetings. (*Id.* at 25).

Tracer testified that he attended most of the Allen Park City Council meetings and that he would regularly speak at the meetings. (Pl.'s Dep. at 23 & 25). The subject of Tracer's comments at the meetings was always the same thing – his assertion that the police officers who had arrested him in 2009 committed crimes against him and that the city was refusing to prosecute those crimes. (*Id*. at 26). One of the police officers that was the subject of Tracer's comments is Wayne Albright. (*Id*. at 26-27).

**The August 2012 Meeting**

During an Allen Park City Council meeting that was held in August of 2012, Tracer was ruled "out of order" because the chair believed that Tracer referring to Albright as a criminal violates the rules of decorum. (Pl.'s Dep. at 27). Tracer was escorted out of that meeting by police officers. Tracer did not use profanity at that meeting and he left the meeting peacefully. (*Id*. at 26-28).

After that August 2012 meeting, Tracer continued to attend meetings on a regular basis and continued to speak about his belief that Albright is a criminal. (Pl.'s Dep. at 28).

**The May 14, 2013 Meeting**

Tracer attended an Allen Park City Council meeting on May 14, 2013.  Tracer testified that after he arrived at the meeting, Tracer walked past Lieutenant Egan and the two men exchanged words.  (Pl.'s Dep. at 30-31).  Tracer testified that he does not recall what he said to Egan.  (Pl.'s Dep. at 31-32).

Tracer spoke at the May 14, 2013 meeting during the public comments portion of the meeting.  (Ex. 6 to Defs.' Motion, video and audio tape of the 5/14/13 Mtg.).  Tracer began his public comments by saying, in regard to a recent article in the newspaper about Councilman Deguilio dropping a case against Albright, "in that article it was stated that Councilman Deguilio fears for his family and his welfare."  Tracer then referenced a vote for a "Constitution Day" and asked, "is there one of you right-wingers that can state which one of Mr. Deguilio's civil rights are being violated when he is in fear of his government or its agents?" Tracer then turned, apparently to look at some high school students that were present at the meeting, and told them not to answer his question, saying "not high school kids, you can't answer."

Matakas then tried to say something but Tracer stated, in a raised voice, "look I'm speaking."  atakas then said, "I'll let you go with your comment but you must direct your comments to the chair, not to the audience."

Tracer then began to speak again and did not appear to direct any other comments to persons in the audience.  Tracer then said, "just so there's no question, Albright is a criminal . . ." After Tracer said that, Matakas said, "you are out of order, you are done."

Tracer then said, "Really? you're a liar and a coward, you're . . ."  The audio was then cut off from the microphone and Tracer can no longer be heard on the video for some time.

8

Tracer testified that after Matakas ruled him out of order, he began packing his stuff up but continued to argue with Matakas as he was leaving. Tracer admits that Matakas had to ask him to leave more than once (Pl.'s Dep at 37) and told him he had violated the rules of decorum (*Id*. at 38). As Tracer was leaving, he called Egan a chicken and began making chicken noises at him.

Tracer testified that after he had left the room, he returned again because he had forgotten his cellphone. (Pl.'s Dep. at 39). After re-entering the room, Matakas told Tracer that he had been ordered out of the meeting. Tracer yelled to the council that "they're all a bunch of fucking rummies." (*Id*. at 40). Matakas again instructed him to leave and Tracer finally left.

The City of Allen Park's attorney, Daniel Grano, was present at the May 14, 2013 meeting. (Grano Dep. at 7).

**Communications After The May 14, 2013 Meeting**

On May 15, 2013, Grano sent James Wilkewitz, the Chief of Police for the City of Allen Park, an e-mail that stated:

> Chief,
>
> Matt Tracer attended last night's council meeting. He was very disruptive from the get go, getting into it with Officer Eagen before the meeting started. Officer Eagen acted exemplary by not engaging and moving to the other side of the auditorium to be as far as possible away from Mr. Tracer. During citizens comments he attacked Officer Albrect [sic] and the Mayor promptly and properly order him to leave (twice), to [sic] commotion stopped the meeting, and as he left Mr. Tracer was swearing and yelling**.** *I don't think the city can ban him from the meetings under the Open Meetings Act, Chris did a memo on that.* I do think that if we charge him with disorderly conduct that a condition of probation could be no contact/attendance at city council meetings while on probation.
>
> I think we should pursue charges against Mr. Tracer. Because I was a witness, I

9

would request a police detective issue a ticket, and we can have Melvindale's city
attorney prosecute the matter.

(Ex. 3 to Pl.'s Br.) (Emphasis added).

On May 16, 2013, Chief Wilkewitz sent Officer Egan an email regarding Tracer that

stated:

>I was contacted by Dan Grano regarding Matt Tracer's conduct at the last council
>meeting. After some discussion with him it was decided to seek criminal charges
>against him for Disturbing Public Meeting; MCL 750.170.
>Please complete a incident report naming the mayor as the complainant and
>yourself and Dan Grano as witnesses, plus any other witnesses available. I will
>place a copy of the recording of the meeting in your shift box, you can tag it as
>evidence.
>Call me if you have questions.

(Ex. 5 to Pl.'s Br.).  Egan responded, via e-mail, stating:

>I've been called worse by councilman and I took your advise not to engage in an
>argument with a crazy person.  All the mayor had to do is ask me to remove him
>and it would have been my pleasure.  He called Albright a criminal so I got off
>easy.  I don't know who Dan Grano is.  I think this is what he wanted but, I will
>do a report tonight.  Do you want me or the DB to issue a citation for disturbing a
>public meeting?

(*Id.*).  To that, Chief Wilkewitz responded, "No ticket needed, I will have the DB do a local

warrant request.  Dan Grano is our local prosecutor."  (*Id.*).

**Events On May 28, 2013**

Tracer testified that he ran into Councilman Dennis Hayes on the morning of May 28,

2013, at a diner they both frequented.  (Pl.'s Dep. at 40-41).  Tracer spoke to Hayes about that

night's upcoming City Council meeting and told Hayes what he was going to bring up at that

meeting.  (*Id.* at 41). Tracer showed Hayes a letter and three pages of a transcript of police

communications he was going to present at the meeting.  (*Id*. at 41-42).

The cover letter to the packet of materials at issue, that Tracer showed and/or delivered to others, stated as follows:

The following pages are evidence in U.S. District Court Case #10-CV-14368

Matthew Tracer vs the City of Allen Park, C. Cates, S. Harvey, M. Symoniak, W. Albright

**The attached transcripts were supplied by the A.P. Police after my successful F.O.I.A. suit.**

It should be known that the Prosecutor defied Judge Page's Orders to turn them over during the prosecution of the false charges leveled against me.

There were numerous crimes committed by the police, and three of the Officers: Albright, Harvey, and dispatcher Dobbertin were disciplined by the department for those crimes.  Why are they not all being prosecuted?  Where is their understanding or regard for the rights of all citizens under *our* United States Constitution? Where is these Officers' understanding and regard for ethical behavior?

The conversation between these officers continued: dispatcher Dobbertin says "put the fear of God in him," Albright replies, "k," and continuing on with "He's a loon, that weird guy, crazy" then Dobbertin adds in a "30-pack too many".  All from three miles away.  My favorite though is when Albright proclaims "Yea, I got him fired up".  **Is that really his job?**

To keep it short, I would suggest that all Allen Park citizens understand that this is what *Government Tyranny looks like*.  Policing by fear is a tactic; it is unconstitutional, and illegal.   I refuse to be afraid of the police force representing my city. In fact, their tactics have only strengthened my resolve.  For those who believe that I have a personal "issue", or am "making it personal" let me just leave you with this.

It was very personal to me when, while illegally in my home, the cops broke my rib.
It was very personal to me when the cops falsely arrested me and then made me

do the "perp-walk" in front of my neighbors.
It was very personal to me when they threw me in a filthy jail cell.
It was very personal to me when I was forced to appear 6 times in front of Judge
Page to defend myself against false charges; ultimately dismissed with prejudice
in my favor.
It was, and still is, very personal to me when our Leadership not only allows these
tactics to continue, but also works to protect these officers – criminals – at what
costs?

Would it be personal to you?

Matt

(Ex. 7 to Pl.'s Br.) (Bolding and italics in original).

The pages of the transcript of police communications that was in the packet of materials

appear to contain several inappropriate comments exchanged between Allen Park police officers

in relation to the call made to Tracer's home in 2009, including: "sorry to send you guys on that

one . . . maybe you can put the fear of god in this guy . . . He's Crazy!"; "He is a Loon" "Wayno

is going to beat this guy up! I just have a feeling hand through the door and around his neck";

"GGGGGGGGOOOOOOOODDDDD Job", "what u get him 4?", "Assault," "Nice", "Fired Up",

"Yea I got Him fired up", "good job guys." (Ex. 7 to Pl.'s Br.).

Tracer testified that those pages consisted of terminal communications between officers

back in 2009. (Pl.'s Dep. at 41-42). Tracer told Hayes he had copies and was going to hand

them out to citizens at the meeting. Tracer testified that Hayes seemed troubled by what Tracer

showed him, particularly with the comments made by officers. (Id. at 42).

Tracer testified that after he left breakfast, he went directly to City Hall. (Pl.'s Dep. at

43). At approximately 10:30 a.m. on May 28, 2013, Tracer spoke to Mrs. McCreety, the

secretary to Matakas and the City of Allen Park's Emergency Manager. Tracer gave McCreety a

12

copy of the letter and transcript that he planned to present at that night's Allen Park City Council meeting.  (*Id*. at 43).

After doing that, Tracer went to the City Clerk's office and left a copy for Mr. Mizzi. (Pl.'s Dep. at 44).  Tracer then went to the Allen Park Police Department and gave a copy of the materials to a police officer at the front desk.  (*Id*. at 44).  Tracer then went home.

At 11:10 a.m. on May 28, 2013, Allen Park City Councilman Dennis Hayes sent an e-mail regarding Tracer to Chief Wilkewitz, copying Matakas, Joyce Parker, and Grano.  That e-mail stated, in pertinent part:

> At breakfast this morning I was approached by the subject resident and presented with a letter and attachments he indicated he would be presenting tonight.  He showed it to me before he was going to have it copied for distribution tonight.
>
> The attachments included a typed transcript of the Police communications (radio transcript I am supposing) obtained via a FOIA request apparently, associated with the arrest he continues to harp on about.
>
> The transcript is rather damning of the Police.  Their own words are despicable and cause for grave concern but that is old news and "water over the dam" and I assume they have all been properly admonished to be careful what they say over the 2 way communication devices.
>
> That aside, I have always argued that IGNORING HIM (letting him go on for the allotted time) is the best way to deal with him.  Since his goal is to provoke, when one responds, he wins as he has succeeded in PROVOKING.
>
> *I know, also, that he calls certain of our Police "criminal" and that is unacceptable.  I know there are those who feel he must be stopped at all costs when he goes on like that.*  I do not have a good idea how to deal with that behvir [sic] but do believe the more attention drawn to it, the worse it seems to become. The Mayor will have to determine how to deal with that and the rest of us should sit on our hands and shut our mouths in my view.
>
> I have personally told him, as has the mayor, to seek a prosecution if he feels one

13

is in order *but don't announce this at the podium*.  I am sure my "out of Council Chambers comments" to him must fall on deaf ears.

. . . .

Just a "heads up" for all concerned and *perhaps the basis for some preparation for the potential fireworks tonight.*

(Ex. 2 to Pl.'s Br.) (Emphasis added).

At approximately 2:00 p.m. on May 28, 2013, Matakas appeared before Judge Richard Page in the 24th Judicial District Court for Wayne County, Michigan and swore to facts stated in a criminal complaint against Tracer.  (*See* Ex. 3 to Defs.' Br.).

In the pending motion, Defense Counsel refers to the transcript of that proceeding as a "preliminary hearing," but the transcript itself is titled "Swear To Before The Honorable Richard A. Page, District Court Judge."  (*Id.*).  The only persons who appear to have been present at that time are Judge Page, Matakas, and Allen Park Police Detective Jeff Miller.  Tracer was not present at that time and it does not appear, from the transcript, that any prosecutor was there on behalf of the City of Allen Park.

Although the city had a video/audio tape of the City Council meeting at issue, where the alleged criminal conduct occurred, that tape was not presented to Judge Page.  Rather, the only evidence presented was Matakas's sworn testimony wherein, he stated that Tracer was the first speaker during public comments and "he started to recite a newspaper article that involved members of the police department.  I let him go forward with that.  At his conclusion of that article, he then started to attack two of our police officers," "verbally," "And said that they were criminals.  That they were people without honor.  And . . .  people of the city should be fearful of their being police officers in the city."  (*Id.* at 4-5).  Matakas stated that he ruled Tracer out of

14

order and then the audio portion of the videotaping was turned off.  Matakas stated that Tracer

then became abusive and was asked to leave the meeting.  Matakas stated that, after leaving,

Tracer came back into the room, shouted obscenities, and was again instructed to leave.  Judge

Page then concluded that there was probable cause for the charges alleged in the complaint sworn

to by Matakas:

> The Court:     All right.
>
> Before me a, a – it's sworn to by the Mayor, that Matthew Tracer was present at a council meeting on May 14, 2013.  And that his actions destructed, destru – disturbed the peace as defined by local ordinance.  And also disturbed a lawful meeting.
>
> Disturbing a lawful meeting is a violation, misdemeanor violation of a local ordinance.
>
> As, the Mayor has mentioned, certainly there are free speech concerns, anytime a citizen wishes to make comments at a public meeting.
>
> However, based on the facts, sworn to by the Mayor, that Mr. Tracer was allowed to make these comments. That even when he was cautioned about the nature of these comments, he continued those comments.
>
> And after finally being instructed to leave the meeting, a lawful instruction based on his prior disturbances, that Mr. Tracer returned to the meeting. Continued the nature of his previous comments.  Added to them by swearing and otherwise disturbing the meeting, which included the presence of some youngsters from Allen Park high.
>
> I find that on a probable cause basis, there has been a, a disturbance of the peace.  Notwithstanding the first amendment.  There has been a disturbance of the lawful meeting.
>
> And I find that on a probable cause basis, this defendant committed those offenses.
>
> I will sign a complaint and a warrant.
>
> I will note for the record, that it appears a special prosecutor has been appointed in this matter.  And that special prosecutor has also approved an authorized warrant in this regard.
>
> Mr. Mayor, if you'll sign the complaint, I will sign the complaint and the warrant.

(Ex. 3 to Defs.' Br.).

The Allen Park police officer who attended the proceeding with Matakas, Detective Miller, then asked Judge Page if the judge could "do a no contact where [Tracer] can't come to the meeting or just a no contact with the mayor." (*Id*. at 9). Detective Miller noted on the record that Tracer "plans on attending the council meeting tonight from my understanding, 'cause he did come to the front window. When I was at the front desk with Sergeant Granica, he said he was coming to the council meeting to distribute some paperwork regarding Officer Albright." (*Id*. at 10).

Judge Page approved a cash bond of $100.00 with a "no contact with the Mayor. And a . . . I'll leave it to your body to enforce it's own rules. If he appears again, if, if there's a problem, bring it to my attention and I'll readdress the bond conditions as soon as I see him." (*Id*.).

An Allen Park Police Department report issued on May 28, 2013 (Ex. 10 to Pl.'s Br.) states, in pertinent part:

> On the above date at approximately 1700 hrs I was advised by Sgt. Felts that an arrest warrant had been issued for Matthew Tracer. Mr. Tracer is a local citizen who has been attending Allen Park City Council meetings regularly. I was advised that *if he was present in the area* to make him aware of the warrant and place him in custody.
>
> I observed Mr. Tracer in front of City Hall and went over to speak with him. I informed him of the warrant and allegations against him. I told him he was under arrest for disorderly conduct. He following [sic] me over to the police department turning himself in. Mr. Tracer was booked and processed without incident.

(Ex. 10 to Pl.'s Br.) (Emphasis added).

Tracer testified that he was standing outside the door of City Hall on the evening of May 28, 2013, and while he was waiting to go into the meeting, he was handing out copies of his paperwork to persons before the City Council Meeting was scheduled to begin. (Pl.'s Dep. at 44-

16

45).  After he had handed out the materials to eight to twelve persons, he was approached by an

Allen Park police officer.  (*Id*.).  Tracer testified that the officer said something like, "Hey, man.

You know, they sent me out here to arrest you" or something to that effect.  (*Id*. at 45).

Tracer testified as follows:

> Q.    Did he say anything else?
> A.    Well, when I asked him why, he said he wasn't really sure because they
>       hadn't gotten the paperwork yet.  He was just told to come and arrest me.
> Q.    So, he said he didn't have a warrant for your arrest?
> A.    I don't think we specifically talked about the warrant.
> Q.    He just said he didn't have the paperwork?
> A.    Right.

(*Id*. at 45-46).

Tracer testified that the officers then took him to jail.  (Pl.'s Dep. at 46).  Tracer testified

he went voluntarily, was not handcuffed, and there was no struggle.  (*Id*. at 46).  Tracer was

fingerprinted, photographed, booked, and placed in a jail cell.  (*Id*. at 46-47).  Tracer testified that

he was in the jail cell for approximately fifteen minutes and that he was released after he paid a

fine.  After being released, Tracer went home.  (*Id*. at 47).

Tracer testified that he did not attend any Allen Park City Council meetings in June, July,

or August of 2013 "because all the court stuff was going on."  (Pl.'s Dep. at 47-48).  After the

charges were dismissed, Tracer began attending meetings again in January and February of 2013.

(*Id*. at 47-48).  He was ruled out of order a couple of times at those meetings but was not asked to

leave.  (*Id.*).  Tracer testified that he is not attending meetings while this litigation is going on.

(*Id*. at 49).

During discovery in this action, Matakas testified as follows as to the May 14, 2013 City

Council Meeting:

17

Q.     Are there any statements in this police report that you actually made?  And while you're looking, too, if there are any statements in this police report that you think are not accurate, if you could point those out, as well.

A.     Well, there's references that I asked Mr. Tracer not to address his remarks to the audience and please address them to the mayor and council.

Q.     You made that at the time of the meeting, correct?

A.     Yes.  And then when he called – after he had read the comments from the newspaper and *then he cited Mr. – called Mr. Albright a criminal, and that's when I ordered him – I ruled him out of order* and he continued to go on and I ruled him out of order and asked him to leave our council chambers.

Q.     *Why did you rule him out of order for calling Mr. Albright a criminal?*

A.     *He has no reference to what he's a criminal about.*

Q.     Well, you saw the transcripts today, didn't you?  Wasn't Mr. Tracer in meetings past advising you that what Officer Albright did to him was criminal?

A.     Mr. Tracer had come to several meetings seeking a reopening at the city level of the officers that were involved in his incident, whatever that date was.  And the council and mayor said that was not going to happen.  He did read from portions of depositions or transcripts of whatever went on in the proceedings against the City of Allen Park and that was all permitted.

Q.     *So why didn't you let Mr. Tracer, on May 14th, 2013, explain why he thought Officer Albright was, in fact, a criminal?*

A.     *I don't think you start that way and say, "Tell me the explanation of the officer's criminality."*

Q.     So you --

A.     He had been reading in many prior meetings.

Q.     *You just didn't like the way Mr. Tracer started?*

A.     *I thought it was improper.*

Q.     *So you thought he should have given you facts before he made the statement that Officer Albright was a criminal?*

A.     *That's correct.*

(Matakas Dep. Trans. at 103-104) (emphasis added).

During discovery, Chief Wilkewitz testified as follows:

Q.     Why did you order the arrest of Tracer?
       MS. FORBUSH: I'm going to object to the form.
       THE WITNESS: I didn't.  I alerted the front desk that there was a warrant

18

for his arrest.

BY MR. GUZALL:

Q      Why did you alert the front desk?  What was so special about Mr. Tracer?

A.      He had been coming to the city council meetings and causing a disturbance in the past.

Q.      So that's why you alerted them?

A.      Yes.

Q.      And you knew that he was coming that night.

A.      I did not know he was coming that night.

Q.      Dennis Hayes put in his e-mail that Mr. Tracer was coming, correct?

A.      Yes.

Q.      So you had it on good authority that Mr. Tracer was going to be showing up that night, correct?

A.      I never relayed – I never even related to Mr. Hayes' e-mail at all.  I just knew there was probably a good chance since he had shown up consistently at prior council meetings that there was a good chance that he may show up again that night.

Q.      Were you aware that Mr. Tracer dropped off a copy of that transcript to the Mayor's office?

A.      No.

Q.      Were you aware that he dropped off a copy to the police department?

A.      No.

(Wilkewitz Dep. Trans. at 111-112).

The Allen Park police officer who arrested Tracer on May 28, 2013, Paul Schryer, testified that his supervisor advised him there was a valid warrant for Tracer's arrest.  (Schryer Dep. Trans. at 30).  He did not see the warrant himself.  (*Id*. at 37).  Schryer further testified:

Q.      Have you ever arrested somebody on a disorderly charge in the past?

A.      Yes.

Q.      Did it happen on a run?

A.      Yes.

Q.      Have you ever arrested a disorderly person in this type of way where you were told by one of your supervisors to go get him?

A.      No.

(Schryer Dep. Trans. at 31).

19

Allen Park City Councilman Dennis Hayes testified that, in his opinion, there was no need to have Tracer arrested for his conduct at the May 14, 2013 meeting because he did not see any crime committed.  (*Id*. at 27-28).  Hayes further testified:

> Q.    Well, what rules does the City have in terms of proceeding at a council meeting?  Rules of decorum?
> A.    We have rules of decorum which were not written by us, they were written by a former council.  And I have routinely objected to them over time and I think they're followed – following them is the exception and violating them is probably more the rule, frankly, if you can understand what they even mean, you know.
> Q.    So in your opinion the rules of decorum are violated, yet nothing is done about them sometimes.  Is that what you are saying?
> A.    I think so.  Yeah, that's my opinion.
> Q.    And then are you also indicating then that there may be some confusion in regard to how to regulate behavior, if you will, that comes under these rules?
> A.    I think that's very clear.
> Q.    Clear as to it being a problem?
> A.    Yes.
> . . . .
> Q.    It's a real simple question.  Are you aware – let's start with this one.  Are you aware of any council members who violated the rules of decorum as set forth by the City?
> A.    Well, I think, yes.
> Q.    Were any of those people charged with a crime?
> A.    No.

(Hayes Dep. Trans. at 40-42).

In support of Defendants' Motion for Summary Judgment, they submitted an affidavit from Judge Page.   Judge Page's Affidavit (Ex. 5 to Defs.' Br.) states that: 1) on May 28, 2013, after conducting a hearing, he found on a probable cause basis that Tracer disturbed the peace and disrupted a lawful meeting in violation of local ordinance; 2) on May 28, 2013, he signed the complaint and arrest warrant for the apprehension of Tracer; and 3) the signed arrest warrant is

20

located in the court's file. Defendants' Motion for Summary Judgment does not attach a copy of the signed warrant as an exhibit.[4]

Along with his response brief, Tracer submitted an Affidavit (Ex. 4 to Pl.'s Br.) wherein he states:

> After I was charged with a crime related to my arrest in the City of Allen Park on May 28, 2013, I was given a blank copy of the claimed warrant for my arrest, near the end of my case in District Court. After my plea deal under advisement time expired, I went to the Allen Park District court to receive a copy of my entire file. The court did not give me a copy of the signed or unsigned arrest warrant. The only copy I had was blank. (See that attached copy to my affidavit). I went back to the District Court in Allen Park in December 16, 2012 [sic] to look at my file and see if there was a signed copy of that arrest warrant, as my attorney Ray Guzall spoke with Judge Richard Page just prior, and Judge Page told him that he did sign the arrest warrant. I then looked in the file that was given to me by one of the clerks of the court and witnesses that the arrest warrant was signed in BLUE FELT TIP INK, and that the blue ink looked fresh and obviously different from the other signed documents in the file which looked like they had been signed on a different day, leading me to conclude that the arrest warrant I was given that was unsigned was the original copy in the file, and was not signed until AFTER I was arrested, thereby making my arrest on May 28, 2013 illegal. The Federal Court in my case should be provided that **original file** from the Allen Park District Court, so this Court can see the difference in that Blue Ink and the other signed documents in that file.

(*Id*. at ¶ 2) (emphasis in original).

## ANALYSIS

Defendants' Motion for Summary Judgment raises five challenges: 1) whether Plaintiff's First Amendment free speech rights were violated (a challenge to Count I); 2) whether Plaintiff can establish a causal connection between his protected speech and the alleged retaliation (a

---

[4]At the hearing, Defense Counsel stated that Defendants requested a signed copy of the arrest warrant at issue but that the state court would not provide them with a copy.

21

challenge to Count II); 3) whether Plaintiff's false arrest, false imprisonment, and malicious prosecution claims fail for various reasons (challenges to Counts II, IV, and V); 4) whether the official capacity claim against Matakas should be dismissed as duplicative; and 5) whether Matakas is entitled to qualified immunity.

## I.     Qualified Immunity

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law.  *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation.  *Dominguez*, 555 F.3d at 549.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial."  *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994).

Here, Defendant Matakas raised the issue in the instant Motion for Summary Judgment, filed after the close of discovery.

22

"Qualified immunity is an affirmative defense, and a defendant bears the burden of pleading it in the first instance." *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). "Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate" both that the challenged conduct violated a constitutional right and that the right was clearly established. *Id.* "If the plaintiff fails to establish either element, the defendant is immune from suit." *Id.*

Tracer's Complaint asserts the following § 1983 claims against Matakas: 1) a claim that he violated Tracer's 1st Amendment rights (Count I); 2) a claim that he retaliated against Tracer in violation of his 1st Amendment rights (Count III); 3) a false arrest claim under the Fourth Amendment (Count II); 4) a false imprisonment claim under the Fourth Amendment (Count IV); and 5) a malicious prosecution claim under the Fourth Amendment (Count V).

With respect to each § 1983 claim asserted against Matakas, the Court will consider whether:  1) viewing the facts in the light most favorable to the plaintiff, plaintiff can establish that a constitutional violation occurred; and 2) if so, whether the right was clearly established at the time of the violation.

### A.    First Amendment Free Speech Claims

With respect to Count I, Tracer alleges that his First Amendment right to free speech, applicable to the State of Michigan and its political subdivisions by operation of the Fourteenth Amendment, has been unlawfully restrained by Defendants.

Tracer alleges that Defendants violated his First Amendment free speech rights by preventing him from speaking at two Allen Park City Council meetings, and by stopping him from distributing materials outside of the City Hall before the May 28, 2013 meeting.

23

"The First Amendment is an important part of our system of self-government.  It

specifically allows for the people 'to petition the government for a redress of grievances.'  U.S.

Const. amend. I."  *Leonard v. Robinson*, 477 F.3d 347, 357 (6th Cir. 2007).  "Whatever

differences may exist about interpretation of the First Amendment, there is practically universal

agreement that a major purpose of that Amendment was to protect the free discussion of

governmental affairs."  *Id.*

The First Amendment reflects "a profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open, and that it may well

include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public

officials."  *N.Y. Times Co. v. Suliveran*, 376 U.S. 254, 270 (1964).  "Even those who advocate

the most narrow interpretation of the freedom of speech agree that in a democratic forum like a

township meeting, the state should abstain from regulating speech."  *Leonard,* 477 F.3d at 357.

"Of course, the constitutional protection of speech is not without limits."  *Id.*

The Sixth Circuit has explained as follows as to how the court should evaluate a free

speech claim under the First Amendment:

> We follow a three-step analysis when evaluating free speech claims under the
> First Amendment: first, we ask whether the First Amendment protects the
> plaintiff's speech; second, we determine the nature of the forum, "because the
> extent to which the Government may limit access depends on whether the forum
> is public or nonpublic"; and third, we "assess whether the justifications for
> exclusion from the relevant forum satisfy the requisite standard." *Cornelius v.
> NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 797, 105 S.Ct. 3439, 87
> L.Ed.2d 567 (1985).

*Child Evangelism Fellowship of Ohio, Inc. v. Cleveland Metro. Sch. Dist*.,__ F. App'x __ , 2015

WL 1261402 at * 3 (6th Cir. 2015).

### 1.    Traced Engaged In Protected Speech.

Tracer's actions in engaging in public comment at public meetings of the Allen Park City Council, and distributing his letter and copies of the police transcript outside of City Hall, constitute protected conduct under the First Amendment.  *See, e.g., Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, (6th Cir. 2010) (public comment at township meetings is protected conduct); *Briner v. City of Ontario*, 370 F. App'x 682, 704 (6th Cir. 2010) (addressing city council during the public comment section of a meeting is protected conduct); *Riddle v Egensperger*, 266 F.3d 542, 550 (6th Cir. 2001) ("Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values.").  Indeed, Defendants do not appear to dispute that Tracer's conduct is protected by the First Amendment.

### 2.    Tracer's Conduct Occurred In A Limited Public Forum And In A Public Forum.

Next, the Court must consider the nature of the forum where Tracer's expression occurred.  The Supreme Court has recognized three types of fora for speech:

> The first type is a traditional public forum. A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a street or park. *See id.* at 45, 103 S.Ct. 948. In traditional public fora, "the rights of the state to limit expressive activity are sharply circumscribed": the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling interest, and may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* The second type of forum has been alternatively described as a "limited public forum," *see Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510, and as a "designated public forum," *see Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). The government may open a limited public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439.

25

> Although the government need not retain the open nature of a limited public forum, "as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry,* 460 U.S. at 46, 103 S.Ct. 948. The third and final type of forum is a nonpublic forum. The government may control access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439; see also Perry, 460 U.S. at 46, 103 S.Ct. 948.

*Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001) (en banc).

Here, the alleged protected speech that Tracer engaged in occurred in two different fora.

First, Tracer spoke at the Allen Park City Council meeting on May 14, 2013, and intended to speak at the May 28, 2013 meeting. Defendants assert that a city council meeting is a limited public forum and the case law supports that proposition. *See, e.g.*, *Jochum v. Tuscola Cnty*., 239 F.Supp.2d 714, 728 (E.D. Mich. 2003) ("A city council meeting is the quintessential limited public forum, especially when citizen comments are restricted to a particular part of the meeting."); *Featherstone v. Columbus City Sch. Dist. Bd. of Educ*., 92 F. App'x 279 (6th Cir. 2004) (School Board meeting open to public is a limited public forum.); *Gault v. City of Battle Creek*, 73 F.Supp.2d 811, 814 (W.D. Mich. 1999) (Battle Creek City Commission meeting is a limited public forum).

"The government may restrict speech in a limited public form as long as the restrictions do 'not discriminate against speech on the basis of viewpoint' and are 'reasonable in light of the purpose served by the forum.'" *Miller v. City of Cincinnati*, 622 F.3d 524, 535 (6th Cir. 2010) (quoting *Good News Club v. Milford Central Sch*., 533 U.S. 98, 102-03 (2001)).

Second, Tracer's alleged protected speech occurred outside of City Hall on May 28, 2013. Tracer testified that he was standing outside of City Hall on the evening of May 28th and, while

26

he was waiting to go into the meeting, he was handing out copies of his paperwork to people before the City Council Meeting was scheduled to begin. (Pl.'s Dep. at 44-45). After he had handed out the materials to eight to twelve persons, he was approached by an Allen Park police officer who then arrested him.

The case law reflects that the sidewalk and street outside of City Hall is a public forum. *See Logsdon v. Hains*, 492 F.3d 334, 345-46 (6th Cir. 2007). As a public forum, governmental restrictions on Tracer's speech outside City Hall are more circumscribed than restrictions on his speech during a City Council Meeting.

### 3.   Assessment Of Justifications

The third step in the analysis is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard.

In their motion, Defendants treat Count I, Tracers' First Amendment claim, as only challenging Defendants' actions in stopping Tracer from speaking at the May 14, 2013 meeting. While he does assert a First Amendment claim based upon that conduct, Count I is not limited to that conduct.

Tracer also contends that, under Count I, he can assert a First Amendment claim based upon Defendants' action in arresting him on May 28, 2013, for the purpose of stopping him from distributing his materials outside of City Hall and preventing him from attending the City Council meeting that night, where he had planned to discuss those materials during the public comment portion of the meeting.

27

a.      **Ruling Tracer Out Of Order And Stopping Him From Speaking At The May 14, 2013 Meeting.**

Defendants assert that governmental entities have a legitimate interest in conducting orderly, efficient meetings.  Citing *Gault,* they assert that "a moderator is permitted to stop an individual from speaking if the individual's speech 'disrupts or otherwise impedes the orderly conduct of a Council meeting."  (Defs.'s Br. at 13).

In *Gault,* the plaintiffs appeared for a public meeting of the Battle Creek City Commission, which allows for a period of public comments.  *Gault*, 73 F.Supp.2d at 812.  The plaintiffs sought to make comments about the police chief's conduct and that, in their view, he was not fit to serve as chief.  When they made assertions about the chief having engaged in an affair with another officer's wife, the chair ordered them to stop their comments or yield to the next speaker. The plaintiffs complied.

At the next meeting, during public comment time, the plaintiffs again attempted to address the Commission regarding the chief.  The plaintiffs allege they were again threatened with being ruled out of order and were prohibited from addressing the Commission.  The defendants asserted that plaintiff Gault was provided the opportunity to speak concerning the general fitness of the chief, but was "ruled out of order" when she made allegations regarding the chief having authorized the illegal cloning of a pager and that she was removed from the Commission chambers only after she continued to disrupt the meeting.  *Id.* at 813.

The district court granted a preliminary injunction requested by the plaintiffs.  In analyzing the success-on-the-merits aspect, the district court concluded that the plaintiffs had demonstrated a substantial likelihood of success on their First Amendment claims.

28

The district court noted that "[i]t is well established that a citizen addressing a city governmental body in a limited public forum may be stopped from speaking if the speech is 'irrelevant or repetitious' or 'disrupts, disturbs, or otherwise impedes the orderly conduct of the Council meeting,' *so long as the speaker is not stopped from speaking because the moderator disagrees with the viewpoint* he is expressing . . ." *Gault,* 73 F. Supp.2d at 814. (emphasis added). That general proposition, however, did not aid the defendants in *Gault* under the facts of the case.

The court stated the "videotape of the April 6, 1999, meeting shows that Plaintiffs, although allowed to speak at length about problems with the police department, *were ruled out of order when they attempted to raise the allegation that [the chief] had an affair"* with the wife of *a co-worker. Id*. at 815 (emphasis added). The defendants argued that the plaintiffs were properly ruled out of order because the affair is a purely personal matter and unrelated to the chief's performance of duties. The district court rejected that argument, concluding that the police chief's affair with another officer's wife is not solely a matter of private concern. The district court also concluded that the allegation that the chief illegally cloned another officer's pager is also a matter of public concern.

The district court in *Gault* concluded the plaintiffs had a substantial likelihood of success on the merits of their First Amendment claims as they were ruled out of order and prohibited from speaking based on the content of their speech.

In *Briner*, a married couple asserted First Amendment and other claims against a city after they were ruled "out of order" and prevented from speaking at a city council meeting*. Briner v. City of Ontario*, 370 F. App'x 682 (6th Cir. 2010). The district court granted summary judgment in favor of the city but the Sixth Circuit reversed. In doing so, the Sixth Circuit noted that the

29

district court had analyzed the issue as follows:

> The record reveals that there is absolutely no basis in fact for this claim.... Mr. Briner addressed the City Council on several occasions. In particular, Mr. Briner spoke to the City Council on February 1, 2007, but was stopped by the Council president when he began, inappropriately, to talk about the instant lawsuit; in fact, he was escorted out of the meeting when he continued to speak after the Council [P]resident told him he was out of order. There is no constitutional right to disrupt city meetings by speaking out of order.
>
> According to the undisputed facts established by Mr. Briner's own testimony, neither Mr. or Mrs. Briner was prevented from making *appropriate* public comments at City Council meetings. Therefore, summary judgment in favor of the City with respect to this claim is appropriate.

*Briner,* 360 F. App'x at 704-05 (emphasis in original).

The Sixth Circuit then explained why and how that analysis by the district court was erroneous and required reversal:

> The district court did not cite any legal precedent for its proposition that the government may limit speech to content it deems "appropriate," nor did it identify any objective criteria for determining whether public comments are "appropriate." The specific speech that the Council President suppressed as "inappropriate" was Mr. Briner's questioning about the litigation-the President (and the district court) deemed the *content* of the questions "inappropriate." The Council President's determination that Mr. Briner was "out of order," and therefore engaged in "inappropriate" public comments, appears to be based on nothing more than the content of Mr. Briner's speech.
>
> Based on the record, the Briners appear to have been engaged in legitimate questioning and criticism of public officials, conduct protected by the First Amendment. There is no evidence on the record that Mr. Briner was engaged in any threatening or harassing behavior, so Mr. Briner should have been allowed to ask the Council (his government) virtually any question on any topic he likes, though the Council would not have been required to answer. The Council would have been within its rights to set certain limits on the public comment portion of the meeting and could have refused to answer questions it does not want to answer; **it cannot, however, prohibit protected political speech on the vague**

30

> **and broad grounds that the content of that speech is "inappropriate."** The Briners raise legitimate questions of material fact for the jury, and summary judgment was inappropriate.

*Id*. at 705 (italics in original, bolding added for emphasis).

Here, Defendants argue that "the content of Plaintiff's speech did not have any bearing on Mayor Matakas' decision to rule Plaintiff out of order." (Defs.' Br. at 14-15).

Construing the evidence in the light most favorable to Plaintiff, however, the Court concludes that a reasonable juror could conclude that Tracer was ruled out of order at the May 14, 2013 meeting because of the content of his speech.

It is true that the City's Rules of Decorum state that a speaker is to address the council and not members of the audience, and that Tracer did briefly turn his head and make a comment that "the high school kids can't answer" the question he had posed to council. But after Matakas told Tracer to "direct his comments here" (ie., to the council), it does not appear that Tracer directed any other comments to members of the audience. Thus, it does not appear that he failed to comply with that rule after having been given a warning on the directive against addressing members of the audience by Matakas.

Although Tracer later raised his voice and called Matakas a liar and a coward – it appears that he did so after he had been ruled "out of order" and told that he "was done" by Matakas. It is also true that Tracer later, after he reentered the room to retrieve his phone, used profanity in that he called the City Council a "bunch of fucking rummies." But significantly, as Tracer stresses in his response brief, a reasonable juror could conclude that he was ruled "out of order" and told that he "was done," right after calling Albright a criminal and before any of that later conduct had occurred.

31

A reasonable juror viewing and listening to the videotape of the May 14, 2013 Allen Park City Council meeting could conclude that Matakas ruled Tracer out of order immediately after Tracer asserted that "Albright is a criminal."

Moreover, Matakas himself testified that "after [Tracer] had read the comments from the newspaper and then he cited Mr. – called Mr. Albright a criminal, and that's when I ordered him – I ruled him out of order." (Matakas Dep. at 103).

Matakas's deposition testimony could be viewed by a reasonable juror as supporting Tracer's assertion that he was ruled out of order, and prevented from speaking, because of Matakas's disagreement with the content of his speech:

> Q.    Why did you rule him out of order for calling Mr. Albright a criminal?
> A.    He has no reference to what he's a criminal about.
> Q.    Well, you saw the transcripts today, didn't you?  Wasn't Mr. Tracer in meetings past advising you that what Officer Albright did to him was criminal?
> A.    Mr. Tracer had come to several meetings seeking a reopening at the city level of the officers that were involved in his incident, whatever that date was.  And the council and mayor said that was not going to happen.  He did read from portions of depositions or transcripts of whatever went on in the proceedings against the City of Allen Park and that was all permitted.
> Q.    So why didn't you let Mr. Tracer, on May 14th, 2013, explain why he thought Officer Albright was, in fact, a criminal?
> A.    I don't think you start that way and say, "Tell me the explanation of the officer's criminality."
> Q.    So you --
> A.    He had been reading in many prior meetings.
> Q.    You just didn't like the way Mr. Tracer started?
> A.    I thought it was improper.
> Q.    So you thought he should have given you facts before he made the statement that Officer Albright was a criminal?
> A.    That's correct.

(Matakas Dep. Trans. at 103-04).

The Court further finds that additional evidence, again taken in a light most favorable to Tracer, could allow a reasonable jury to find that Tracer was prevented from speaking at the Allen Park City Council meeting on May 14, 2013 because of the content or viewpoint of the speech that Tracer sought to express:

- Councilman Hayes's Letter to Matakas and others stating, "I know, also, that he calls certain of our Police 'criminal' and that is unacceptable.  I know there are those who feel he must be stopped at all costs when he goes on like that," and "I have personally told him, as has the mayor, to seek a prosecution if he feels one is in order but don't announce this at the podium."  (Ex. 2 to Pl.'s Br.).

- Tracer's testimony that, during an Allen Park City Council meeting that was held in August of 2012, Tracer was ruled out of order because the chair believed that Tracer referring to Albright as a criminal violates the rules of decorum, and he was escorted out of that meeting by police officers although he did not use profanity and was leaving peacefully.  (Pl.'s Dep. at 27).

- The City of Allen Park's attorney sending a letter to Chief of Police regarding Tracer after the May 14th meeting stating "I don't think the city can ban him from the meetings under the Open Meetings Act, Chris did a memo on that."  (Ex. 3 to Pl.'s Br.).

Accordingly, the Court finds that there is a genuine issue of material fact for trial as to Tracer's First Amendment claim that is based on his having been prevented from speaking at the May 14, 2013 meeting.

> **b.** **Arresting Tracer To Prevent Him From Passing Out His Materials In Front Of City Hall And Speaking At May 28, 2013 Meeting**

In his response brief, Tracer asserts that he has a viable First Amendment claim based on Defendants arresting him on May 28, 2013, in order to prevent him from passing out his materials in front of City Hall before the scheduled meeting, and in order to prevent Tracer from attending that meeting.  (Pl.'s Br. at 4).  To support this theory, Tracer directs the Court to

33

*Logsdon v. Hains*, 492 F.3d 334 (6th Cir. 2007).

The plaintiff in *Logsdon* was an active member of the pro-life movement, who engaged in sidewalk protests near abortion clinics. Plaintiff's § 1983 suit, which included First Amendment claims, arose from two encounters with the City of Cincinnati Police Department. The district court dismissed the action, but the Sixth Circuit reversed.

The Sixth Circuit noted that the plaintiff had denied asserting a First Amendment retaliation claim in the district court. Rather than couch his claim as a retaliation claim, the plaintiff sought to challenge Defendants' actions in removing him from the public sidewalk as a violation of his First Amendment freedoms. His theory is that his arrest impeded his freedom of expression and assembly. *Id*. at 344. The Sixth Circuit concluded that the plaintiff could proceed under such a theory.

The court explained that the plaintiff alleged that the defendants removed him from the sidewalk, thereby causing him to cease his protest, ostensibly for violating the state's criminal trespass law. *Id*. at 345-46. But the plaintiff alleged "that Defendants were motivated by the content of his speech in removing him from the public forum, and not by any purported criminal trespass" and, accordingly, the plaintiff "had stated a claim that Defendants had violated his First Amendment rights by restricting his speech on the basis of content." *Id*. at 346. The Sixth Circuit also found that the defendants were not entitled to qualified immunity and explained:

> Here, Defendants ostensibly arrested Plaintiff for violating Ohio's criminal trespass law. However, if instead, as Plaintiff appears to allege, Defendants arrested him because of the content of his speech, then Defendants acted in violation of the First Amendment in ways that should have been clear to a reasonable officer. Viewing the allegations in the light most favorable to Plaintiff, the district court erred dismissing Plaintiff's First Amendment claims.

34

*Id*. at 346.

Although this case is at the summary judgment phase, rather than the motion to dismiss phase, the Court concludes that Tracer has identified sufficient evidence to proceed under this theory.

That is, taking the evidence in the light most favorable to Tracer, a reasonable juror could find that Tracer was arrested on May 28, 2013 in order to stop Tracer from passing out his materials outside of City Hall before the meeting, and in order to prevent Tracer from speaking about those materials during the public comment portion of the May 28, 2013 Allen Park City Council meeting.  That evidence, construed in the evidence most favorable to Tracer, includes:

- Although Grano sent an e-mail to Wilkewitz on May 14, 2013 stating we should pursue charges, and have an outside attorney prosecute the matter, there is no evidence to indicate that an outside prosecutor had taken any action to pursue charges against Tracer as of May 28, 2013.

- Tracer told Councilman Hayes he was going to come to the May 28, 2013 meeting and he was going to talk about the transcript of the police communications and hand out copies of them.

- Tracer left a copy of his letter and the materials he intended on passing out at the May 28, 2013 meeting with Matakas's office and with the police department sometime around 10:30 a.m. on May 28, 2013;

- Hayes sent Matakas an e-mail on May 28, 2013, at 11:10 a.m., advising him that Tracer intended on speaking at the May 18, 2013 meeting, that Tracer had the transcript of unfavorable police communications, and suggesting "the basis for some preparation for the potential fireworks tonight."

- Approximately three hours later, at 2:00 p.m. on May 28, 2013, Matakas appeared before Judge Page to swear out a complaint so that Tracer could be arrested.  No prosecutor was at that proceeding.

- Matakas went to that proceeding on May 28, 2013, with an Allen Park police officer who

35

stated on the record that Tracer "plans on attending the council meeting tonight from my understanding, 'cause he did come to the front window. When I was at the front desk with Sergeant Granica, he said he was coming to the council meeting to distribute some paperwork regarding Officer Albright."

• The police report authored by the officer who arrested Tracer on May 28, 2013 stated that he had been advised that an arrest warrant had been issued for Tracer, that "Tracer is a local citizen who has been attending Allen Park City Council meetings regularly," and that he "was advised that *if [Tracer] was present in the area*" around City Hall that he should be arrested.

Accordingly, construing the evidence in the light most favorable to Tracer, the Court concludes that he can establish a Constitutional violation by Matakas with respect to Count I.

The Court also concludes that the law was clearly established at the time of the alleged violation. Under the "clearly established" inquiry, the question is whether the right was so clearly established that a reasonable official would understand that what he or she is doing violates the law. *Jones v. Byrnes*, 585 F.3d at 975. "The essential inquiry is whether the defendant had fair warning that his [or her] actions were unconstitutional." *Hensley v. Gassman*, 693 F.3d 681, 693–94 (6th Cir.2012). This inquiry must be undertaken in the consideration of the specific context of the case, not as a broad proposition. *Jones,* 585 F.3d at 975. The Sixth Circuit's decisions in *Briner* and *Logsdon* constitute such clearly established law. The Court therefore concludes that Defendant Matakas is not entitled to qualified immunity as to Count I.

## II.   Tracer's First Amendment Retaliation Claim

With respect to Count III of his complaint, Tracer's alleged constitutional violation is his claim that government officials retaliated against him for exercising his First Amendment right to free speech.

"It is well established that governmental actions, which standing alone do not violate the

36

Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 (6th Cir. 1999). In its "*en banc* decision in *Thaddeus-X v. Blatter*," the Sixth Circuit "crystalized the basis for First Amendment retaliation claims into a three-part analysis. To establish an affirmative case, the plaintiff must show (1) that [he] engaged in protected conduct; (2) that there was an adverse action taken against [him] 'that would deter a person of ordinary firmness from continuing to engage in the conduct'; and (3) that 'there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Cameron v. Grainger Cnty.*, 274 F. App'x 437, 441 (6th Cir. 2008) (quoting *Thaddeus-X,* 175 F.3d at 394). The "plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith v. Campbell,* 250 F.3d 1032, 1037 (6th Cir. 2001). "If the plaintiff is able to make such a showing, the defendant then has the burden of showing that the same action would have been taken even absent the plaintiff's protected conduct." *Id.*

Here, Defendants challenge Tracer's First Amendment retaliation claim by asserting that Tracer "cannot establish that his arrest was a response to the exercise of his free speech rights." (Defs.' Br. at 17). That is, they only challenge the third element, the causal connection.

Defendants do not challenge Tracer's ability to establish the first or second elements. Moreover, the record evidence before the Court shows that he can establish those elements.

First, Tracer engaged in protected conduct in that he spoke during the public comment portion of the May 13, 2013 City Council meeting, wherein he called Albright a criminal, and when he discussed and/or provided his complaint letter and the attached transcripts of the 2009

police communications to Councilman Hayes, Matakas, the Allen Park Police department, and unidentified citizens, on May 28, 2013.

Second, there is no dispute that an "adverse action" was taken against Tracer. With respect to this second element, an "adverse action" is one that caused the plaintiff to suffer a type of injury that would likely chill or silence a person of ordinary firmness from future First Amendment activities. *Thaddeus-X v. Blatter*, 175 F.3d at 397. Here, an adverse action was taken against Tracer following the May 14, 2103 meeting in that he was charged with two criminal misdemeanors (disturbing the peace and disturbance of a lawful meeting), was arrested on May 28, 2013, and was placed in a jail cell.

Defendants contend that Tracer cannot establish the third element, a causal connection, because Tracer "cannot establish that his arrest was a response to the exercise of his free speech rights." (Defs.' Br. at 17).

With respect to the third and final element, causal connection, the Sixth Circuit has explained that "[p]rotected speech does not *cause* an adverse action in the traditional sense because protected speech does not act, but we say protected speech causes an adverse action if the speech motivates an individual actor to take acts that then proximately cause an adverse action." *King v. Zamiara*, 680 F.3d 686, 694-95 (6th Cir. 2012) (emphasis in original). "Subjective motivation appropriately enters the picture on a retaliation claim because our concern is with actions by public officials taken with the intent to deter the rights to free expression guaranteed under the First Amendment. *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998) ('[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for another reason, would have been proper.')." *Id.*

38

The Sixth Circuit has further explained that circumstantial evidence is often needed to

prove the causal connection element:

> Motive is often very difficult to prove with direct evidence in retaliation cases.
> *Bloch*, 156 F.3d at 682–83. Circumstantial evidence may therefore acceptably be
> the only means of establishing the connection between a defendant's actions and
> the plaintiff's protected conduct. We have previously considered the temporal
> proximity between protected conduct and retaliatory acts as creating an inference
> of retaliatory motive. *Paige*, 614 F.3d at 282–83; *Muhammad v. Close*, 379 F.3d
> 413, 417–18 (6th Cir.2004) ("[T]emporal proximity alone may be significant
> enough to constitute indirect evidence of a causal connection so as to create an
> inference of retaliatory motive.") (internal quotation marks omitted).

*King*, 680 F.3d at 695-96.

Viewing the evidence in the light most favorable to Tracer, the Court concludes that he

has submitted sufficient evidence to create a genuine issue of material fact as to whether the

adverse action was motivated by Tracer's protected conduct:

- Although Grano sent an e-mail to Wilkewitz on May 14, 2013 stating we should pursue charges, and have an outside attorney prosecute the matter, there is no evidence to indicate that an outside prosecutor had taken any action to pursue charges against Tracer as of May 28, 2013.

- Tracer told Councilman Hayes he was going to come to the May 28, 2013 meeting and he was going to talk about the transcript of the police communications and hand out copies of them.

- Tracer left a copy of his letter and the materials he intended on passing out at the May 28, 2013 meeting with Matakas's office and with the police department sometime around 10:30 a.m. on May 28, 2013;

- Hayes sent Matakas an e-mail on May 28, 2013, at 11:10 a.m., advising him that Tracer intended on speaking at the May 18, 2013 meeting, that Tracer had the transcript of unfavorable police communications, and suggesting "the basis for some preparation for the potential fireworks tonight."

- Approximately three hours later, at 2:00 p.m. on May 28, 2013, Matakas appeared before

39

Judge Page to swear out a complaint so that Tracer could be arrested.  No prosecutor was at that proceeding.

•   Matakas went to that proceeding on May 28, 2013, with an Allen Park police officer who stated on the record that Tracer "plans on attending the council meeting tonight from my understanding, 'cause he did come to the front window.  When I was at the front desk with Sergeant Granica, he said he was coming to the council meeting to distribute some paperwork regarding Officer Albright."

•   Hayes' testimony that others violate the rules of decorum all the time during meetings, but that no one other than Tracer has been arrested, and Hayes' testimony that Tracer did not violate any laws at the May 14, 2013 meeting and should not have been arrested.

•   Hayes' e-mail also stated that it is "unacceptable" for Tracer to refer to Allen Park police officers as criminals, that some feel that Tracer "must be stopped at all costs," and that Hayes and Matakas have previously told Tracer not to announce such views "at the podium."

•   Matakas's testimony wherein he stated that he ruled Tracer out of order because his comments were "improper."

Accordingly, construing the evidence in the light most favorable to Tracer, the Court concludes that he can establish a Constitutional violation by Matakas with respect to Count III.

The Court also concludes that the law was clearly established at the time of the alleged violation.  The Court therefore concludes that Defendant Matakas is not entitled to qualified immunity as to Count III.

### C.   Malicious Prosecution

Tracer asserts a malicious prosecution claim against Matakas, under federal and state law, in Count V of his Complaint.

To prevail on a malicious-prosecution claim under § 1983 premised on a violation of the Fourth Amendment, a plaintiff must prove: 1) the defendant made, influenced, or participated in

40

the decision to prosecute the plaintiff; 2) there was a lack of probable cause for the prosecution; 3) as a consequence of the prosecution, the plaintiff suffered a deprivation of liberty, as understood in Fourth Amendment jurisprudence, apart from the initial seizure; and 4) the criminal proceedings was resolved in the plaintiff's favor. *Sykes*, 625 F.3d at 308-09.[5]

In their motion, Defendants contend that Tracer's malicious prosecution claim against Matakas fails because Tracer cannot establish the second element, a lack of probable cause for the prosecution.

In response to this challenge to these claims, Tracer argues that there was not probable cause to charge him with the crimes at issue. Tracer also contends that Matakas can be held liable for malicious prosecution because he intentionally misled Judge Page and omitted information in order to get Judge Page to find probable cause to arrest Tracer. *See Richardson v. Nassar*, 421 Fed Appx. 611, 616 (6th Cir. 2011) and *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669 (6th Cir. 2005).

If a plaintiff presents evidence that a defendant intentionally misled or omitted critical information at a probable cause hearing for an arrest warrant, the Court then assesses whether the plaintiff could show that the judge would not have issued the warrant had the defendant presented accurate information to the judge. *Richardson v. Nassar*, 421 F. App'x 611, 616 (6th Cir. 2011). In other words, if the defendant had made false statements or material omissions, the court "set[s] aside the statements and includes the information omitted to determine" if the

---

[5]Tracer's state-law version of this claim under Michigan law also requires him to prove an absence of probable cause. *See, e.g., Burleigh v. City of Detroit*, 80 F. App'x 454, 461 (6th Cir. 2003) ("To prevail on his false arrest, false imprisonment, and malicious prosecution claims under state law, [a plaintiff] must prove an absence of probable cause. *See Tope v. Howe*, 179 Mich.App. 91, 445 N.W.2d 452, 459 (1989)."

evidence presented was still sufficient to establish probable cause.  *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).

Here, Tracer asserts that Matakas intentionally made inaccurate statements to Judge Page and that Matakas failed to provide him with a copy of the audio/videotape of the May 14, 2013 Allen Park City Council meeting.  The alleged inaccurate statements are that: 1) Tracer did not state that the police officers at issue "were people of dishonor"; and 2) Tracer did not state that "people of the City should be fearful of there being police officers in the City."  Tracer asserts that Matakas also failed to advise the judge that Tracer said "God bless freedom of speech" upon exiting and Tracer contends that he was not abusive.  (Pl.'s Br. at 20).

While swearing to a criminal complaint Matakas did exaggerate and/or make some inaccurate statements, noted above, and he did not provide the audio/video tape of the meeting to Judge Page.  Nevertheless, Tracer cannot show that the judge would not have issued the arrest warrant if Matakas had testified as to Tracer's statements with complete accuracy or provided the judge with the audio/video tape of the city council meeting.

Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.  *Sykes,* 625 F.3d at 306.  To determine whether probable cause existed to authorize the arrest of Tracer, the Court considers the totality of the circumstances known to the judge and whether they were sufficient to warrant a prudent person in believing that Tracer had committed the offenses at issue.  *Id.*

Judge Page found probable cause to believe that Tracer had: 1) disturbed the peace in violation of Allen Park City Code of Ordinances Chapter 26, Section 214; and 2) disturbed a lawful meeting in violation of Allen Park City Code of Ordinances Chapter 26, Section 217.

42

Chapter 26, Section 214 of the City of Allen Park's Code of Ordinances is titled "Disturbing the peace" and provides that "No person in the city shall disturb, tend to disturb or aid in disturbing the peace of others by violent, tumultuous, offensive or obstreperous conduct, and no person shall knowingly permit such conduct upon any premises owned or possess by him or under his control."

Chapter 26, Section 217 of the City of Allen Park's Code of Ordinances is titled "Disturbance of lawful meeting" and provides that "No person shall make or excite any disturbance or contention in, or fail to leave upon being requested to do so, any private or public meeting, conducted on or in private or public property, where citizens are peaceably and lawfully assembled."

Matakas's accurate statements to the court, and the audio and video tape of the meeting, reflect that: 1) Tracer failed to leave the May 14, 2013 City Council meeting after Matakas ruled him out of order and asked him to leave; 2) Tracer returned to room after he had left the meeting, disrupting the meeting; and 3) Tracer used profanity at the meeting, calling the City Council members "a bunch of fucking rummies."

The Court concludes that, even if Matakas intentionally misstated or omitted information, Tracer cannot show that Judge Page would not have found probable cause and issued the arrest warrant.

Accordingly, the Court concludes that Tracer cannot establish a Constitutional violation as to Count V and Matakas is entitled to qualified immunity. The Court shall dismiss this Count.

### D.      False Arrest And False Imprisonment

Tracer's complaint asserts a false arrest claim under federal and state law in Count II and

43

a false imprisonment claim under federal and state law in Count IV.   Both counts are asserted

against Defendant Matakas alone.

A false arrest claim "requires a plaintiff to prove that the *arresting officer* lacked probable

cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir.

2005) (emphasis added).   "Probable cause to make an arrest exist if the facts and circumstances

*within the arresting officer's knowledge*" were sufficient to warrant a prudent man in believing

that the defendant had committed or was committing an offense.  *Pyles v. Raisor*, 60 F.3d 1211,

1215 (6th Cir. 1995) (emphasis added).

Notably, however, Tracer did not sue the officer who arrested him on May 28, 2013, or

any other officers involved in his arrest or imprisonment.

Moreover, Tracer's false arrest and false imprisonment claims in this action are somewhat

unusual in that they are premised on Tracer's allegation that an arrest warrant was not actually

signed by Judge Page before Officer Schryer arrested Tracer on May 28, 2013.

If Plaintiff could establish that Judge Page had not actually signed the arrest warrant

before Officer Schryer arrested him, then Tracer could possibly state a false arrest claim against

Officer Schryer.  But Tracer has not asserted any claims against Officer Schryer in this action.

As to Matakas's involvement, the evidence before the Court establishes that Matakas

swore to a criminal complaint before Judge Page on May 28, 2013, at which time Judge Page

found probable cause and stated that he would sign a warrant for Tracer's arrest.  Tracer has

neither alleged, nor offered any evidence to establish, that Matakas played any role in Tracer's

arrest or imprisonment after his appearance before Judge Page.

This Court therefore concludes that Tracer has not stated a viable false arrest or false

imprisonment claim against Matakas.

Tracer has also failed to identify any clearly established law that would have put Matakas on notice that his conduct could subject him to liability for false arrest or false imprisonment under federal law.

This Court therefore concludes that Matakas is entitled to qualified immunity and the Court shall dismiss Counts II and IV of Tracer's Complaint.

## II.     Tracer's Official Capacity Claim

On page 20 of Defendants' Motion, Defendants assert that "[a]s Plaintiff has asserted a First Amendment claim against the City of Allen Park, his claim against Mayor Matakas in his official capacity is merely duplicative, and should be dismissed on that basis."  (Defs.' Br. at 20).

In response to this challenge, Plaintiff's Counsel stated: "Plaintiff does not argue against the law cited by Defendants as to 'official capacity' related to his 1983 claims."  (Pl.'s Br. at 25).

This Court confirmed at the hearing that Tracer agrees that his First Amendment claims against Matakas in his official capacity should be dismissed as duplicative of his First Amendment claims against the City of Allen Park.

## III.    Counts Not Challenged In Motion

There are two counts of Tracer's complaint that either were not challenged at all by Defendants or were improperly challenged for the first time in their reply brief.

### A.      Abuse Of Process Count

The Abuse of Process Count was not challenged in Defendants' motion or opening brief. Nevertheless, Tracer's response brief discussed the claim and asserted that he can proceed with the claim.  Then, Defendants challenged the Abuse of Process claim for the first time in their

45

reply brief.

The Court declines to address this challenge because it was first raised, improperly, in Defendant's reply brief.  *See, e.g., Gantz v. Wayne Cnty. Sheriff's Office*, 513 F. App'x 478, 482 n.4 (6th Cir. 2013) (Arguments first raised in a reply brief are not properly before the court.).

### B.    Intentional Infliction Of Emotional Distress

Defendants have not challenged Tracer's claim for intentional infliction of emotional distress in connection with their motion.  As such, this claim also remains.

### CONCLUSION & ORDER

As noted above, Tracer agrees that his First Amendment claims against Matakas in his official capacity should be dismissed as duplicative of his First Amendment claims against the City of Allen Park.  The Court therefore DISMISSES Tracer's First Amendment claims against Matakas in his official capacity only.

In addition, for the reasons set forth above, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment.  The motion is GRANTED to the extent that the Court grants summary judgment in favor of Defendants as to Counts II (False Arrest), IV (False Imprisonment), and V (Malicious Prosecution) of Plaintiff's Complaint.  The motion is DENIED in all other respects.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  August 11, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on

46

August 11, 2015, by electronic and/or ordinary mail.

S/Jennifer McCoy                   

Case Manager
